UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JOHN BURLEY, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| WILDHORSE THERAPEUTICS, INC, JAY C. GRAHAM, ANTHONY BAHR, BRIAN A. BERNASEK, JONATHAN M. CLARKSON, SCOTT A. GIESELMAN, DAVID W. HAYES, STEPHANIE C. HILDEBRANDT, GRANT E. SIMS, MARTIN W. SUMNER, and TONY R. WEBER, | 1. VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>2. VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 |
| Defendants. | |

John Burley ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. This action is brought by Plaintiff against WildHorse Resource Development Corporation ("WildHorse" or the "Company") and the members of WildHorse's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9 ('Rule 14a-9"), 17 C.F.R. 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between WildHorse and Chesapeake Energy Corporation ("Chesapeake").

2. On October 29, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with the Chesapeake, pursuant to which, each outstanding share of WildHorse stock will be converted into the right to receive either (i) 5.336 shares of Chesapeake common stock and $3.00 in cash (the "Mixed Consideration"), or (ii) 5.989 shares of Chesapeake common stock (the "Stock Consideration" and together with the Mixed Consideration, the "Merger Consideration").

3. On December 26, 2018, the Board authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act, that recommends WildHorse shareholders vote in favor of the Proposed Merger.

4. While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections of both companies; (ii) the valuation analyses performed by the Company's financial advisors, Tudor Pickering Holt & Co Advisors LP ("TPH") and Morgan Stanley & Co. LLC ("Morgan Stanley" and together with TPH, the "Financial Advisors"), in support of their fairness opinions; and (iii) the background of the Proposed Merger.

5. It is imperative that the material information omitted from the Proxy is disclosed prior to special meeting of Wildhorse shareholders to vote on the Proposed Merger currently scheduled for January 31, 2019, at 2:00 p.m., Central Time, (the "Shareholder Vote") so that they can properly exercise their corporate suffrage rights.

6. For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from holding the Shareholder Vote on the Proposed Merger until the material information discussed below is disclosed to WildHorse shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, WildHorse's common stock trades on the New York

3

Stock Exchange, which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10. Plaintiff is, and has been at all relevant times, the owner of WildHorse common stock and held such stock since prior to the wrongs complained of herein.

11. Defendant WildHorse is a Delaware corporation with its principal executive offices located at 920 Memorial City Way, Suite 1400, Houston, Texas 77024. WildHorse is an independent oil and natural gas company focused on the acquisition, exploitation, development and production of oil, natural gas and NGL properties primarily in the Eagle Ford Shale and Austin Chalk in East Texas. WildHorse's common stock trades on the NYSE under the symbol "WRD."

12. Individual Defendant Jay C. Graham is a director of WildHorse, the Chief Executive Officer of the Company, and the Chairman of the Board.

13. Individual Defendant Anthony Bahr is a director of WildHorse and the President of the Company.

14. Individual Defendant Brian A. Bernasek is, and has been at all relevant times, a director of WildHorse.

15. Individual Defendant Jonathan M. Clarkson is, and has been at all relevant times, a director of WildHorse.

16. Individual Defendant Scott A. Gieselman is, and has been at all relevant times, a director of WildHorse.

17. Individual Defendant David W. Hayes is, and has been at all relevant times, a director of WildHorse.

18. Individual Defendant Stephanie C. Hildebrandt is, and has been at all relevant times, a director of WildHorse.

19. Individual Defendant Grant E. Sims is, and has been at all relevant times, a director of WildHorse.

20. Individual Defendant Martin W. Sumner is, and has been at all relevant times, a director of WildHorse.

21. Individual Defendant Tony R. Weber is, and has been at all relevant times, a director of WildHorse.

22. The parties identified in ¶¶ 11-21 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.     Background and the Proposed Merger**

23. WildHorse is an oil and natural gas company focusing on the acquisition, exploitation, development, and production of oil, natural gas, and natural gas liquid resources. The company primarily holds interests in the Eagle Ford Shale in East Texas and the overpressured Cotton Valley formation in North Louisiana. As of December 31, 2017, it had a total leasehold position of approximately 387,091 net acres in the Eagle Ford Shale and 90,062 net acres in overpressured Cotton Valley formation, as well as 454.3 million barrels of oil equivalent of total proved reserves. The company was founded in 2013 and is headquartered in Houston, Texas.

24. Chesapeake, incorporated on November 19, 1996, is a producer of natural gas, oil, and natural gas liquids (NGL) in the United States. The company operates in two segments: Exploration and Production; and Marketing, Gathering and Compression. The exploration and production segment is responsible for finding and producing oil, natural gas and NGL. The marketing, gathering and compression segment is responsible for marketing, gathering and

compression of oil, natural gas, and NGL. It has a diverse resource base of onshore the United States unconventional natural gas and liquids assets. It has positions in resource plays of the Eagle Ford Shale in South Texas, the Utica Shale in Ohio, the Anadarko Basin in northwestern Oklahoma, and the stacked pay in the Powder River Basin in Wyoming. Its natural gas resource plays are the Haynesville/Bossier Shales in northwestern Louisiana and East Texas and the Marcellus Shale in the northern Appalachian Basin in Pennsylvania. It also owns an oil and natural gas marketing business.

25.     On October 30, 2018, WildHorse and Chesapeake issued a joint press release to announce the Proposed Merger stating, in relevant part, as follows:

> **CHESAPEAKE ENERGY CORPORATION ACCELERATES STRATEGIC PLAN WITH ACQUISITION OF WILDHORSE RESOURCE DEVELOPMENT CORPORATION FOR A COMBINATION OF CHESAPEAKE COMMON STOCK AND CASH**
>
> **Premier Eagle Ford Asset with Access to Premium Gulf Coast Markets Will Increase Cash Flow and Margins; Strengthens Financial Profile and Shareholder Return Opportunities**
>
> **OKLAHOMA CITY and HOUSTON, October 30, 2018** – Chesapeake Energy Corporation (NYSE:CHK) and WildHorse Resource Development Corporation (NYSE:WRD) today jointly announced that Chesapeake has entered into a definitive agreement to acquire WildHorse, an oil and gas company with operations in the Eagle Ford Shale and Austin Chalk formations in southeast Texas, in a transaction valued at approximately $3.977 billion, based on yesterday's closing price, including the value of WildHorse's net debt of $930 million as of June 30, 2018. At the election of each WildHorse common shareholder, the consideration will consist of either 5.989 shares of Chesapeake common stock or a combination of 5.336 shares of Chesapeake common stock and $3 in cash, in exchange for each share of WildHorse common stock. The transaction was unanimously approved by the Board of Directors of each company.
>
> The acquisition of WildHorse expands Chesapeake's oil growth platform and accelerates progress toward its strategic and financial goals of enhancing margins, achieving sustainable free cash flow generation, and reducing net debt to EBITDA ratio.
>
> Transaction highlights and pro forma performance projections include:

- Materially Increases Oil Production/Enhances Oil Mix: Projected to double adjusted oil production by 2020 from stand-alone adjusted 2018 estimates, increasing to a projected range of 125,000 to 130,000 barrels (bbls) of oil per day in 2019, and 160,000 to 170,000 bbls of oil per day in 2020; Chesapeake's 2020 projected adjusted oil production mix is expected to increase to approximately 30% of total production, compared to approximately 19% today;

- Significant EBITDA Margin Accretion: Increases projected EBITDA per barrel of oil equivalent (boe) margin by approximately 35% in 2019 and by approximately 50% in 2020, based on current strip prices;

- Transforms Portfolio with Expanded Oil Growth Platform: Adds approximately 420,000 high margin net acres, approximately 80 to 85% of which is undeveloped, in the Eagle Ford Shale and Austin Chalk formations with strategic access to premium Gulf Coast markets; addition of the WildHorse asset creates an expansive oil growth platform which complements Chesapeake's existing high margin Eagle Ford and Powder River Basin positions; moving forward, Chesapeake expects over 80% of future drilling and completion activity will be directed toward high-margin oil opportunities.

- Substantial Cost Savings: $200 to $280 million in projected average annual savings, totaling $1 to $1.5 billion by 2023, due to operational and capital efficiencies as a result of Chesapeake's significant expertise with unconventional assets and technical and operational excellence; incremental savings through elimination of redundant corporate overhead, gathering, processing and transmission synergies and improved capital markets execution due to improved credit metrics;

- Accelerates Deleveraging: Transaction will accelerate progress toward goal of 2.0x net debt to EBITDA ratio; improves projected 2019 net debt to EBITDA ratio to approximately 3.6x and projected 2020 net debt to EBITDA ratio to approximately 2.8x, based on current strip prices.

Doug Lawler, Chesapeake's President and Chief Executive Officer, stated, "This transaction accelerates Chesapeake's strategic plan and expands the value-creation opportunities for our shareholders by adding a premier asset at an attractive valuation, significantly boosting oil production, EBITDA margins and cash flow growth, while improving our leverage metrics. The addition of WildHorse, together with our substantial growth profile in the Powder River Basin, advances our transformation into a highly competitive company with a diverse portfolio of high-quality assets, a stronger balance sheet and meaningful oil-growth potential."

Jay Graham, Chief Executive Officer and Chairman of the Board of Directors of WildHorse Resource Development said, "We are extremely proud of the company

we built and brought public less than two years ago. This combination creates an impressive oil growth platform which provides both immediate value and potential for significant long-term upside to our shareholders. As a highly regarded operator, Chesapeake brings the technical expertise and operational efficiencies needed to maximize the value of this premier asset."

Upon closing, Chesapeake shareholders will own approximately 55% of the combined company, and WildHorse shareholders will own approximately 45%, depending on the consideration elected. Prior to closing, WildHorse will designate two individuals, presently expected to be Jay Graham and current WildHorse Director David Hayes to be added to Chesapeake's Board of Directors. R. Brad Martin and Doug Lawler will continue to serve as Chesapeake's Chairman of the Board of Directors and President, Chief Executive Officer and Director, respectively.

Investment funds managed by NGP Energy Capital Management, LLC, collectively WildHorse's largest shareholder, have entered into a voting and support agreement in support of the transaction. NGP's Managing Partner, Tony Weber, commented, "NGP has observed Chesapeake's significant transformation over the last several years and believes it is a compelling investment. We have the utmost confidence in the leadership team's strategy and ability to deliver incremental, meaningful value creation."

Chesapeake expects to finance the cash portion of the WildHorse acquisition, which is expected to be between $275 million and approximately $400 million, through its revolving credit facility. The transaction, which is subject to shareholder approvals from both companies and customary closing conditions and regulatory approvals, is expected to close in the first half of 2019.

Goldman Sachs & Co. LLC acted as financial advisor, and Wachtell, Lipton, Rosen & Katz and Baker Botts L.L.P. acted as legal counsel to Chesapeake. Tudor, Pickering, Holt & Co., Morgan Stanley & Co. LLC and Guggenheim Securities, LLC acted as financial advisors and Vinson & Elkins LLP and Akin Gump Strauss Hauer & Feld LLP acted as legal counsel to WildHorse and NGP, respectively.

26. The Merger Consideration represents inadequate compensation for WildHorse shares. Since the announcement of Proposed Merger, the stock prices of both WildHorse and Chesapeake have fallen—Quad/Graphics dropping significantly more than LSC. Accordingly, the implied value of the Merger Consideration has also decreased significantly. It is therefore imperative that shareholders receive the material information (discussed in detail below) that

Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

**II.     The Proxy Is Materially Incomplete and Misleading**

27.     On December 26, 2018, WildHorse filed the Proxy with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to cast an informed vote on Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

28.     First, the Proxy omits critical information related to the financial projections of both companies, including the unlevered free cash flow projections for both WildHorse and Chesapeake. While the Proxy does include "levered free cash flow" in the WildHorse forecasts, it fails to include the standalone unlevered cash flows that form the basis of the Financial Advisors' analyses.  As stated in the Proxy, to perform their *Discounted Cash Flow Analysis* the Financial Advisors utilized "the standalone unlevered cash flows expected to be generated by each of WildHorse and Chesapeake, based on the estimates reflected in the WildHorse Company Forecasts." Proxy at 113. It is indisputable that the unlevered free cash flow projections were the most important input in the Financial Advisors' *Discounted Cash Flow Analysis*—the entire analysis is based upon discounting the unlevered free cash flow projections to present value. However, Defendants elected to exclude the unlevered free cash flow projections from the Proxy, despite the fact that they simultaneously elected to include a purported "summary" of the Financial Advisors' *Discounted Cash Flow Analysis* and both companies' projections.

29. Additionally, both of the Financial Advisors relied upon synergy projections in rendering their fairness opinions and performing the corresponding valuation analyses. TPH reviewed and discussed with WildHorse management "certain cost savings projected by the management of WildHorse to result from the merger[.]" Proxy at 107. Morgan Stanley reviewed and discussed with WildHorse management "information relating to certain strategic, financial and operational benefits anticipated from the merger, prepared by the management of WildHorse [.]" Proxy at 110-111. Moreover, each companies' board of directors list the synergies as a reason for recommending the approval of the Proposed Merger. Proxy at 91, 102. Yet, the projected synergies are entirely omitted from the Proxy. The projected synergies are plainly material and speak squarely to the question that the Company's shareholders must answer in determining whether to vote in favor of the Proposed Merger: is a smaller stake in the combined company more or less valuable than a full stake in the standalone company? Without the projected synergies, Defendants present the Company's shareholders with only a fraction of the equation, rendering them unable to answer this question and assess the fairness of the Proposed Merger. Thus, the omitted projected synergies must be disclosed.

30. The omission of the unlevered free cash flow and synergies projections renders the financial projections included in the Proxy misleading. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by the Financial Advisors, but have omitted others. Thus, their omission renders the projections disclosed misleading.

31. Furthermore, each company's management prepared two distinct sets of projections—one set of projections for their company and one set of projections for the other company. On page 124, the Proxy discloses the prospective financial and operating information regarding WildHorse for 2019 through 2023, prepared by the management of WildHorse and modified by the management of Chesapeake. However, the Proxy fails to disclose which case of WildHorse management projections were modified by the management of Chesapeake—Case A, Case B, or Case C. Each case of WildHorse projections had its own set of assumptions that significantly influenced the valuation picture of the Company. Thus, it is important to know which case of projections WildHorse provided to Chesapeake and/or which case of projections Chesapeake thought most accurately represented the future value of WildHorse. Accordingly, disclosing the Chesapeake modified WildHorse projections without providing the origin case of the projections, renders the table summarizing such projections on page 124 of the Proxy misleading.

32. Second, with respect to the *Discounted Cash Flow Analysis* prepared by the Financial Advisors, the Proxy fails to disclose the following key components—in addition to the omission of the unlevered free cash flow projections—used in their analyses: (i) the inputs and assumptions underlying the calculation of the discount rate range of 8.0% to 10.0% (including the WACC/CAPM components) utilized for both companies; (ii) the inputs and assumptions underlying the terminal multiples used for each company; (iii) the actual terminal values calculated; and (iv) the amount of net debt used to adjust each company's enterprise value.

33. These key inputs are material to WildHorse shareholders, and their omission renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the

fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

34. Without the above-omitted information and the unlevered free cash flow projections WildHorse shareholders are misled as to the reasonableness or reliability of the Financial Advisors' analysis, and unable to properly assess the fairness of the Proposed Merger. As such, these material omissions render the summary of the *Discounted Cash Flow Analysis* included in the Proxy misleading.

35. Additionally, in summarizing the *Selected Transaction Analysis* and the *Implied Offer Premia* prepared by the Financial Advisors, the Proxy fails to disclose the individual multiples and metrics for each transaction utilized in the analyses. A fair summary of these analyses requires the disclosure of the individual multiples and metrics for each transaction; merely providing the mean or median values that a banker applied is insufficient, as shareholders are

unable to assess whether the banker applied appropriate metrics, or, instead, applied unreasonable metrics in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summaries provided in the Proxy misleading.

36. Third, the Proxy states that WildHorse executed confidentiality agreements with multiple parties, including Chesapeake, but fails to disclose whether such agreements contained a standstill provision and/or a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or are still in effect. On page 160-161, the Proxy states that "[f]rom October 29, 2018 and continuing until the earlier of the effective time of the merger and the termination of the merger agreement, WildHorse has agreed not to (and it will cause its subsidiaries not to) terminate, amend, modify or waive any provision of any confidentiality, "standstill" or similar agreement to which it or any of its subsidiaries is a party." This indicates that not only standstill provisions, but also DADWs were in effect after the signing of the Merger Agreement

37. Accordingly, the express communication of the existence of such provisions is material to WildHorse shareholders, as they bear directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal. The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed confidentiality agreements could have made a superior proposal. If those confidentiality agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the descriptions of the confidentiality agreements the Company entered into in the *Background of the Merger* section of the Proxy misleading. Any reasonable shareholder would deem the fact that

the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

38. In sum, the omission the of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff and other WildHorse shareholders will be unable to cast an informed vote in connection with the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of Section 14(a) of the Exchange Act**

39. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

41. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

42. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

43. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) the financial projections for both companies; (ii) the valuation analyses performed by the Financial Advisors; (iii) the background of the Proposed Merger.

44. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

45. Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections and the details surrounding discussions with other interested parties and the Financial Advisors. Defendants knew or were negligent in not knowing that the material information

identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review the Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46. Each of the Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it—which they were required to do carefully. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of financial projections.

47. WildHorse is also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

48. The misrepresentations and omissions in the Proxy are material to Plaintiff and other WildHorse shareholders, and will deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

49. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50. The Individual Defendants acted as controlling persons of WildHorse within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of WildHorse, and participation in and/or awareness of the WildHorse's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of WildHorse, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

51. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of WildHorse, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Merger. The Proxy at issue contains the unanimous recommendation of the Board to approve the Proposed Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

53. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands relief in his favor and against the Defendants jointly and severally, as follows:

A. Preliminarily enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Merger, unless and until Defendants disclose the material information identified above that has been omitted from the Proxy;

  B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

  C. Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

  D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

  E. Granting such further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 2, 2019       Respectfully submitted,

              */s/ Juan E. Monteverde*
              Juan E. Monteverde

              **MONTEVERDE & ASSOCIATES PC**
              The Empire State Building
              350 Fifth Avenue, Suite 4405
              New York, NY 10118
              Tel.: (212) 971-1341
              Fax: (212) 202-7880
              Email: jmonteverde@monteverdelaw.com

              *Counsel for Plaintiff*